I assume we're talking about 06-56-660 now. Yeah. Yes. Seems like a pretty simple case. I mean, if we're going to certify this, then she didn't make a mistake in refusing to exercise her supplemental jurisdiction. So we review the federal issue. Right. And as I said before, the, the, the central issue in this case is the substantial uncertainty of case of case law on, on, on a public forum in California constitution, whether it's certification, supplemental jurisdiction, or penitent jurisdiction. They all turn on the same issue of whether state law is substantially uncertain. What I want to know about this case is should we go ahead and decide it or should we just hold it until we get the other one back? Assuming we certify. Is there any reason not to decide this? Well, I think, I think 0-1. On the federal issue. Are you talking about 0-6 or 0-1? Yeah, well, I'm talking about 0-6. All we have is the federal issue, really. Right. That, if, if you're going to certify 0-1, then you should wait on 0-6. Why? But why? It's a federal issue. Because the California Supreme Court could rule under state law that the airport is a public forum and then a much higher standard strict scrutiny might apply or intermediate scrutiny would apply. Whereas. But we know under the federal law, the airport is not a public forum. Bingo. Right. But she, we, we originally alleged a state cause of action. I see. So you'd want to reinstate. We would like that reinstate. You'd want to reinstate your state law claim. Exactly. I see. We say that was an abuse of discretion. Even if you can decide a case on a state law basis, you don't want to reach the federal constitutional issue. Well, the law says the court should not reach the federal issue if there is an alternative grounds upon which the case can be decided. That's not, it's not my preference. That's what the law says, as the court is well aware. That's what. City of Mesquite. That's all the way back to City of Mesquite. That's what Justice Mosk preached. Right? I don't know what Justice Mosk preached. You don't? That was before my time. You know, you got to learn a little history. He's a young guy. And he learned it from, from, from Justice Lindy. I believe that came from Justice, Judge Norris. No, no, no, not Norris. Norris came much later. It was Justice Lindy, Hans Lindy, who was a classmate of mine in law school. One of the only geniuses I've ever met in my life. Of course, it's hard to know who's a genius and who isn't. I'm sure your honor is a genius. No, no, I don't want to be one. But I think on 06, that if the court is going to certify 01, which we hope it doesn't. Sit on 06. We should just stay 06 and wait. We should not submit it today. We should just hold it. Yeah. Okay. Because, because if the court does rule that it's a public forum under state law, then that would, that would result in our state cause of action being reinstated. And the court would have to then decide the state public forum issue. Gotcha. So that would be the appropriate path to follow. Just a couple of comments. We've been up here for quite a while time and I appreciate the court's indulgence, but the complaints that the city referred to, they're all from city personnel. They're all from city employees. And therefore, in our view, in our view there, in our view there of questionable, questionable veracity and, and reliability. Go out and get offended to make a report. Is that what you're saying? Yeah. Secondly, secondly, the panel in 01 remanded for a specific purpose. And that seems to be, have been lost in the discussion. And that is augment the record on the issue of airport security. We're not going to go back and re-litigate annoyance and inconvenience and fraud and bad conduct and ugly people and things of this sort. We're going to, that's what the court said. If they, if this court panel certifies, then, then the record should have been augmented on the issue of security. And our contention is that they have not done that. Well, the record is what it is. And we just, if we certify it, we send all our stuff to the Cal Supreme Court and they then go at it. And unfortunately, unfortunately, the district court did not make any findings on the issue of security. But we didn't tell the district court to make findings on security. We told the parties to augment the record with admissible evidence. Well, it is what it is. It is what it is. This is true. And if that's the court's decision, then so be it. But, but that's really the issue. And they have not established a valid interest in security. And the, if you compare the experts on both sides of this issue, what their, what their governmental interest boils down to is that in some instant of a security person being distracted by a solicitor, a terrorist is going to rush into the airport with a backpack and blow it up. And, and every expert, credible expert has said that's simply preposterous or ludicrous. The airport is in this constant state of flux. It's never going to be in a situation that we can say, okay, here it is. This is the way it's going to be now. And we can, we can, we can posit a ruling on this factual pattern. For example, right now, as we speak, these baggage screening devices that are for, that are causing these queues and, and, and, and so forth, they're going in line as we speak. They're going out of the lobbies and they're going back behind the ticketing areas, somewhere out of the view of the public and out of the view of, of the airport personnel. They're not going to be there anymore. That's going to free up a tremendous amount of space. They're not going to be there. We have automated check-in that we didn't have before, where people just go in and put their credit card or something else in the machine and then they're, there's no agent. You can get your boarding pass at home. And as our, our expert from MIT testified, this is going to greatly speed up the process of, of, of, of people going through the airport. And it's going to reduce congestion. And this is going on as we speak. And who knows what other technological innovations with these facial recognition devices that are going into some airports where people just walk right through, et cetera, et cetera. So it seems to me that the airports are getting better, not worse. By becoming more and more intrusive in secret ways. Maybe. All the more reason to have people practicing the first amendment out there. So that we at least have some people that are hanging on to the civil liberties by the skin of their teeth. So, so these things are, are going on right now. People are becoming more comfortable. As they familiarize. Name one. Me. Mr. Most. Stooges. Other people back here. People are becoming as they, as they become more familiar with the process, they do become more comfortable with what's going on out there. Well, I'm not a witness in your case, but every time I go to the airport, they've invented something new that I have to do. Well, that's how you have to take your driver's license out of your wallet and your toothpaste has to go into a plastic bag. The point is, why do people have to sacrifice their civil liberties? And a voice says, if you see anybody acting strange, call a cop. But, but, but it's, it's, it's, again, it's, it's, it's, it's a time old aphorism that the people and their liberty should not suffer as a result of government incompetency. Yeah, those of us who flew before hijackings to Cuba remember a completely different world. The government's incompetent. Why should civil liberties pay the price for that? The, the unprofessional, incompetent people should pay the price for that. And the government should spend the money and train them up properly. Why should we sacrifice our civil liberties? Because we're not allowed to profile. That's about what it boils down to. Well, that's debatable or not. So, I mean, the idea of future donations, give out an envelope, send in your money later on, there's declarations in the record, that's been tried. Yeah, you got to get them while they're, get them while you got them trapped. That's been, not trapped. There's no captive audience. We stay out of those lines. That's, that's the other groups that this city refuses to do anything about. Anyway, we have your point about what you want us to do. Yeah, and, and, and, but, but, but I do have, I do want to make the point that, that there are simple, readily available, uncomplicated, that even the city could implement, time, place, and manner regulations to every single one of these interests. There's no reason to kick everybody out of the airport. There's no reason to put them under the, under the escalators, where nobody could see them, and that was an issue in Cuba also. Nobody could see them until it was too late. Court specifically noted that in Cuba. So, what I'm talking about here, Cuba may have been the cow palace, Cuviela may have been something else, but we are talking about the same phenomenon. How do you, how do you contact people? How do you show them your, your literature? How do you engage them in a discussion? If they want to give a donation, if you want to ask them for a donation, we're willing to take them over to the designated area and exchange the money there. What is wrong with that? There's nothing wrong with that. We're adhering to Lee. That's what Lee talked about, the exchange of money, reaching in your pocket, pulling out that money, and we're willing to abide by that. So, there's no justification for any of these interests asserted by the city. And to the extent that there is, ISCON is willing to cooperate, not only with the city, but to help the city enforce reasonable regulations as it applies to other organizations as well. Thank you very much. Well, you've had the full exercise of your First Amendment rights. Right? No, I appreciate your passion. I really do. And thank you for it. So, what's wrong with what he's suggesting? What's wrong with it? Tell me. Well, let's see. I'll, the one part, if you're talking about literally, but, or just generally, if you take, for example, his statement that it's improper for them to take people from inside the terminals and take them outside to get money, that's not true. I mean, what I'm saying is there's some specific, I guess, scenarios that he's talking about that aren't correct. And I don't know how... What if everything he said is true? That they're willing to do? Partly because this ordinance, remember this ordinance is addressed globally. And I think Justice Marshall, in her order, carefully mentioned that, that it's not just, we're not talking about just ICON. In fact, the United States Supreme Court in the Heffron case said the same thing. We're not just talking about the problems with Heffron. We're talking about those that any of the other 19 organizations are out there, any of the other 90 or so solicitors that are out there. You check them out. If they're not, if they're not complying, you kick them out. Well, first, well, in order to check them out, you actually have to check them. You have to have more people. Is that right? Isn't that right? You have to, definitely. I suppose if you had a solicitation squad that followed them all around. Yeah, that's right. Part of the problem is we don't, the airport... I mean, part of what's going on in this country today is full employment, you know. You think we're ever going to change all this that we're having now? It's going to go on for a long, long time. And so you've got another 15 or 20 people going around. Maybe you get a percentage of the take. I don't know, you know. Attach forfeiture to it and make it pay for itself. Do you agree that we should just hold, if we certify the other case, that we should hold this case? I think it would be helpful for the court to resolve it from a federal standpoint. Why? As well. Oh, two reasons. I mean, it's not going to certainly going to harm terribly the airport for the court just to hold up on. I don't misunderstand. I mean, really. But there is one thing that it could do, and that is that the... Assuming the court comes out upholding the ordinance, that that would broadcast to the rest of the, at least the rest of the airports here, that at least under federal law, they can do certain things. Secondly, it would allow the Supreme Court of California, when it hopefully would review the matter, to see this is what happens in one context, what do you think would happen in another context, if you don't have this federal... They know that from Lee, though, don't they? They know it from Lee, and they know it from Heffron, and they know it from some other cases, that's true. So I can't push the case. We'd like to have, obviously, a decision. On the other hand, certainly that's not a problem to hold up on it, frankly. But, you know, airports physically vary. What might be good for LAX might not be good for some other airport. Absolutely. Yeah. And that's up to the city council, the legislative authority. Does the city allow the Salvation Army to go out there with those kettles? They couldn't do it inside the terminals under 171.07. They could do it in a designated area. They could do it in designated areas. Now, being a lawyer, I'm thinking, well, you know, I know they ring bells. Is that going to create a problem? That may be something that would have to be looked into specifically to see if that would be permitted. Nobody's asked for that. Oh, it might sound like a security alarm or something. Exactly. There could be a number of possibilities. Say they're singing carols out there. They have the which? Carols, you know, Christmas carols. Christmas? They can only sing holiday carols. Holiday carols. Holiday carols. Or they sing God Bless America. Right. Or they're good musicians that play music, soothing music. They go out there. I'm on the Salvation Army board, so I'm always thinking ahead for them, you know. All right. I'll suggest it to them.  Thank you. Thank you. All right. We'll defer submission on this one. And the next one has been submitted. All right, yeah. That'll do it, huh? Thank you. We enjoyed the colloquies and discussion.
judges: Pregerson, Trott, Paez